**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**George INGRAM, Defendant–Appellant.**

**No. 91–3912.**

United States Court of Appeals,
Seventh Circuit.

Argued June 2, 1992.

Decided Nov. 10, 1992.

As Amended Nov. 12, 1992.

Stephen J. Eisenberg (argued), Madison, Wis., for Ingram.

Before BAUER, Chief Judge, and COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

In April 1989, George Ingram entered into a plea agreement with the United States Attorney's Office for the District of Colorado. In May 1991, a federal grand jury in the Western District of Wisconsin indicted Mr. Ingram on drug charges that he contends were precluded by the April 1989 Colorado plea agreement. Mr. Ingram moved to .dismiss the indictment and to require the government to comply with the terms of the April 1989 plea agreement. The district court denied Mr. Ingram's motion on the grounds that the April 1989 plea agreement unambiguously bound only the United States Attorney's Office for the District of Colorado and that the government did not unfairly induce Mr. Ingram to enter the agreement. Mr. Ingram pleaded guilty with reservation of his right to appeal the district court's denial of his motion to dismiss. Mr. Ingram now appeals, and we affirm.

## I

## BACKGROUND

A. · *Facts*

In mid–1983, George Ingram was convicted on state drug charges and began serving a state sentence in Colorado. In 1986, Mr. Ingram was transferred to the Federal Correctional Institution of Oxford, Wisconsin (FCI Oxford), to serve part of a federal sentence he had received in 1985. At that time, FCI Oxford correctional officials discovered an on-going conspiracy to smuggle methamphetamine into the prison. In March 1987, FBI Special Agent Richard Staedtler, of the Madison, Wisconsin office of the FBI, joined FCI Oxford officials in their investigation of the smuggling scheme. They monitored and tape-recorded phone calls made by Mr. Ingram and several other inmates suspected as participants in the scheme. Seeking to identify

John W. Vaudreuil, Asst. U.S. Atty., Timothy O'Shea (argued), Office of the U.S. Atty., Madison, Wis., for U.S.

subscribers to Colorado telephone numbers that Mr. Ingram had called, Agent Staedtler contacted FBI agents in Colorado in early April 1987. Agent Staedtler learned that several of the subscribers were suspected members of a methamphetamine trafficking organization led by Steven "Harpo" Miller ("the Miller Organization"), which was at that time being investigated in Colorado by the Mountain States Task Force. Agent Staedtler informed the task force of the activities that had been uncovered at FCI Oxford. Soon thereafter, in early April 1987, Bernard Hobson, Assistant United States Attorney (AUSA) for the District of Colorado, called Agent Staedtler to ask about the FCI Oxford investigation.

Mr. Ingram was scheduled for release from FCI Oxford near the end of May 1987. On April 27, 1987, Mr. Ingram called Danny Hockersmith in Colorado and said: "George says he's gonna do one more deal before he goes. Says 'Missouri this time.'" [1] On May 3, 1987, Mr. Ingram called Mr. Hockersmith again and told him to mail "the package" on Tuesday to Terri Coyle, at an address in Raytown, Missouri. The following day, May 4, Patrick Coyle, an inmate at FCI Oxford, called Terri Coyle and told her to watch her mailbox on Wednesday or Thursday. On May 10, Terri Coyle visited Patrick Coyle at FCI Oxford.

Correctional officers who videotaped the visit suspected that Terri Coyle had given small balloons to Patrick Coyle along with some food. Immediately after the visit, Patrick Coyle was placed into a "dry cell." The same day, Mr. Ingram called another associate from the Miller Organization and said: "[T]he piggies got my boy." Def. Ex.4 at 9. Two days later, on May 12, three balloons containing methamphetamine were recovered from Patrick Coyle. Mr. Ingram was not disciplined by FCI Oxford officials and was not aware that they knew of his involvement. In late May 1987, Mr. Ingram was transferred back to the Colorado state correctional system.

In June and September of 1987, pursuant to a District of Colorado grand jury subpoena, members of the Mountain States Task Force visited FCI Oxford and made copies of some of the telephone tape recordings. On September 30, 1987, Agent Staedtler spoke with Grant Johnson, AUSA for the Western District of Wisconsin. Agent Staedtler's official report of the conversation states:

AUSA JOHNSON further advised that he has been in periodic contact with AUSA BERNIE HOBSON, Mountain States Federal Drug Task Force, Denver, Colorado, regarding this matter. AUSA JOHNSON stated that he and AUSA HOBSON have agreed that all participants in captioned drug distribution activities, including both Denver drug suppliers and FCI Oxford inmates who received the drugs, will be prosecuted, but that no decision has been made to date on whether the FCI Oxford inmates and their intermediary associates will be prosecuted in the Western District of Wisconsin or in the federal courts in Denver, Colorado.

Def. Ex.3.

Mr. Ingram finished serving his Colorado sentence in December 1987. One year and four months later, on March 17, 1989, a federal grand jury in the District of Colorado returned a fifteen-count indictment against eight members of the Miller Organization, including Mr. Ingram. Count I charged that the defendants conspired to possess with intent to distribute, and to distribute, methamphetamine in Colorado, between July 17, 1987, and April 23, 1988. Five of the remaining counts charged Mr. Ingram with distributing methamphetamine in 1987 and 1988. All of the activity in the indictment allegedly occurred in Colorado, and it all occurred *after* Mr. Ingram was transferred from FCI Oxford to the Colorado correctional system.

Attorneys John Moorehead and Theodore Shih were appointed to defend Mr. Ingram. Mr. Ingram pleaded not guilty to the charges, and attorneys Shih and Moore-

---

1. *See* Def. Ex.4 at 7 (notes from FCI correctional Lieutenant Dan Alberts, who kept a log of inmate telephone calls he monitored and recorded).

head initiated plea negotiations with Colorado AUSA Johnson. AUSA Hobson indicated to attorney Shih that the government was investigating Mr. Ingram's possible criminal conduct outside of Colorado. The Wisconsin investigation was the only other investigation of Mr. Ingram that AUSA Hobson knew about. Mr. Shih asked AUSA Hobson about the location of the other investigations and the nature of Mr. Ingram's suspected activities, but AUSA Hobson refused to reveal either. Mr. Shih later discussed with Mr. Ingram what possible activity AUSA Hobson could be referring to, but Mr. Ingram never mentioned his methamphetamine trafficking activity in Wisconsin. Mr. Ingram was not even aware that federal authorities knew of his involvement in the FCI Oxford smuggling operation. Thus, Mr. Shih had no knowledge of Mr. Ingram's criminal activity in Wisconsin.

AUSA Hobson later told Mr. Shih that the authorities in the unidentified jurisdictions "were not especially interested in pursuing prosecution against Ingram." Affidavit of Theodore Shih, R. 133 Ex. 1 ¶ 3. AUSA Hobson did not indicate to Mr. Shih that he and Wisconsin AUSA Johnson had agreed in 1987 that Mr. Ingram would be prosecuted either in Colorado or Wisconsin for his part in the FCI Oxford smuggling scheme. According to AUSA Hobson, by 1989, neither the Colorado nor the Wisconsin United States Attorney officers were "especially enthusiastic" about prosecuting the FCI Oxford conspiracy. AUSA Hobson did tell Mr. Shih that the potential charges in other districts were pre-Guidelines charges, which indicated that they involved activity that occurred before November 1987. AUSA Hobson told Mr. Shih that he was neither willing nor authorized to bind any federal district other than the District of Colorado. R. 125 at 49.[2] Mr. Shih acknowledged that AUSA Hobson told him

that he "wasn't going to tie the hands of" the investigating districts, and that "as a result it was possible that Mr. Ingram might be prosecuted in other federal districts." Affidavit of Theodore Shih, R. 133 at 23.

Mr. Ingram later offered to plead guilty to Count II, charging him with distribution of methamphetamine on August 5, 1987, which was the only pre-Guidelines offense charged. AUSA Hobson agreed and drafted a plea agreement, which stated that the United States Attorney's Office for the District of Colorado would dismiss the other four counts of the indictment and agree not to file any additional criminal charges for criminal activities that occurred in the District of Colorado. Mr. Shih was concerned about the phrase "that occurred in the District of Colorado." At a later deposition, Mr. Shih stated: "I was concerned that if the activity was limited to criminal activity which allegedly occurred physically in the District of Colorado, it might not encompass all the activity that the government thought Mr. Ingram was involved in as a part of the alleged Miller gang." Because of this concern, Mr. Shih requested replacing "that occurred in the District of Colorado" with the phrase "arising from Mr. Ingram's criminal activity in the District of Colorado." The substance of the final plea agreement was expressed in a letter from AUSA Hobson to Mr. Shih, which stated, in relevant part:

> [T]he United States Attorney's Office for the District of Colorado ... further agrees not to file any additional criminal charges in the District of Colorado which are known to this office arising from Mr. Ingram's criminal activities in the District of Colorado.

Letter of April 25, 1989, R. 133 Ex. 2. Mr. Ingram also agreed that this was the substance of the agreement and that no other promises had been made to him.[3] Pursu-

---

**2.** AUSA Hobson's notes from a telephone conversation with Mr. Shih on April 5, 1989, state:

> Talked to Ted Shih ... atty for G. Ingram. Discussed reasons why [defendant] only charged w/ these counts, etc.—*advised any plea only for this Fed. Dist.*, etc. Offer=plea

to consp. count only; he will come by Friday to crunch the numbers on the Guidelines. Gov't Ex.C at 1 (emphasis supplied).

**3.** At the change-of-plea hearing, AUSA Hobson, Mr. Ingram, and Mr. Shih exchanged the following words before the court:

ant to Mr. Ingram's guilty plea, he was convicted and sentenced in June 1989 to a six-year term of imprisonment.

## B. *District Court Proceedings*

On May 9, 1991, a Western District of Wisconsin grand jury returned a one-count indictment against Mr. Ingram, Danny Hockersmith, Patrick Coyle, and Terri Coyle. The indictment charged the co-defendants with conspiring to smuggle meth-amphetamine into FCI Oxford in May 1987. Other than Mr. Ingram, none of the co-defendants had been charged in the 1989 District of Colorado indictment. Mr. Ingram moved to dismiss the indictment on the ground that it violated the plea agreement he and Mr. Shih had reached with AUSA Hobson in the District of Colorado case. The motion was assigned to a magistrate judge, who conducted an evidentiary hearing on August 2, 1991.

On September 16, 1991, the magistrate judge entered a report and recommendation that Mr. Ingram's motion to dismiss be granted. The magistrate judge reasoned that the insertion of the "arising from" language into the plea agreement reasonably meant that the government was agreeing not to prosecute anywhere activity "arising from" Ingram's criminal activity in Colorado. The government filed an objection to the magistrate judge's recommendation, and the matter was reviewed by the district court. On October 10, 1991, the district judge entered an opinion and order rejecting the magistrate judge's recommendation, and denying Mr. Ingram's motion to dismiss the indictment. The district court

concluded that, when read as a whole, the plea agreement unambiguously limited only the United States Attorney's Office for the District of Colorado from filing additional charges in the District of Colorado. The district court also concluded that the government did not unfairly induce Mr. Ingram to enter the Colorado plea agreement by implying that the plea precluded all prosecutions in any location for any criminal activity connected with the Miller Organization.

On October 16, 1991, Mr. Ingram pleaded guilty with reservation of his right to appeal the district court's denial of his motion to dismiss the indictment. On December 13, 1991, the district court sentenced Mr. Ingram to five years' imprisonment, to run concurrently with the sentence he was serving on the 1989 District of Colorado conviction. Mr. Ingram now appeals.

## II

## ANALYSIS

On appeal, Mr. Ingram challenges both of the district court's grounds for denying his motion to dismiss. He submits that the Colorado plea agreement is ambiguous and that any ambiguity must be construed against the government. Alternatively, Mr. Ingram contends that Colorado AUSA Hobson unfairly induced him to plead guilty with the implied promise that the government would not prosecute him anywhere for any other criminal activity that had already occurred in connection with the Miller Organization. Mr. Ingram bases his

---

THE COURT: Okay. What is the plea agreement in this case? And I believe you have a copy of this in front of you. I have it marked as Court Exhibit No. 1. Do you have that in front of you?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Would you read along as Mr. Hobson explains what the plea agreement is?

MR. HOBSON: Judge, very briefly, in exchange for Mr. Ingram's plea of guilty to Count Two of this indictment, *the U.S. Attorney's Office for the District of Colorado* agrees not to file any sentence enhancements or additional charges against the defendant *in this district arising from his narcotics trafficking activities here in the District of Colorado....*

THE COURT: Mr. Shih, is that the plea agreement as you understand it?

MR. SHIH: Yes, it is, Your Honor. I think, also, there has been given to the Court a copy of the letter agreement which was sent by Mr. Hobson to our office dated April 26th, 1990.

THE COURT: That's attached to Court Exhibit No. 1 as an exhibit.

MR. SHIH: Those two contain the agreement between the defendant and the government.

THE COURT: Is that correct, Mr. Hobson?

MR. HOBSON: That is correct, sir.

Gov't Ex.D at 9–10, 13 (emphasis supplied).

arguments in both contract law and in the supervisory powers of the courts to ensure that the government acts fairly in the criminal justice system.

### A. *Applicable Principles of Law*

■ The government must fulfill any promise that it expressly or impliedly makes in exchange for a defendant's guilty plea. *Santobello v. New York*, 404 U.S. 257, 261, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). Plea agreements are contracts, and their content and meaning are determined according to ordinary contract principles. *Carnine v. United States*, 974 F.2d 924, 928 (7th Cir.1992); *United States v. Sophie*, 900 F.2d 1064, 1071 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990).

■ It is a fundamental principle of contract interpretation that extrinsic evidence is inadmissible to prove the meaning of a contract that is unambiguous on its face.[4] A contractual provision is ambiguous if it is subject to more than one reasonable interpretation. *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1298 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 208, 121 L.Ed.2d 148 (1992). Whether a contract is ambiguous or unambiguous on its face is a question of law and is subject to review de novo. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir.1986). "If it is unambiguous as a matter of law, and there is no suggestion of government overreaching of any kind, the agreement should be interpreted and enforced accordingly." *Id.* Plea agreements, however, are "unique contracts" and the ordinary contract principles are supplemented with a concern that the bar-

gaining process not violate the defendant's right to fundamental fairness under the Due Process Clause. *Carnine*, 974 F.2d at 928.[5] "[B]oth to protect the plea bargaining defendant from overreaching by the prosecutor and to insure the integrity of the plea bargaining process, the 'most meticulous standards of both promise and performance must be met by [the government].' " *United States v. Bowler*, 585 F.2d 851, 854 (7th Cir.1978) (quoting *Correale v. United States*, 479 F.2d 944, 947 (1st Cir.1973)). Accordingly, even if a plea agreement is unambiguous on its face, courts may refuse to enforce it if the government is found guilty of overreaching.

### B. *Application to this Case*

#### 1. Ambiguity

■ Mr. Ingram contends that, under contract principles, any ambiguity in his plea must be construed against the government, as drafter. The agreement expressly prohibited the government from filing additional charges arising from Mr. Ingram's prior activities in the District of Colorado. However, Mr. Ingram invites our attention to caselaw recognizing that plea agreements may contain implied promises and that their literal language is not dispositive.[6] Specifically, Mr. Ingram argues that, construing his plea agreement as a whole, it is reasonable to believe that the language limiting the agreement to charges filed in the District of Colorado impliedly includes all charges which *could have been* filed in Colorado at the time the plea was entered. Moreover, both Mr. Ingram and Mr. Shih testified by deposition that Mr. Ingram would not have entered

---

4. *Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 814 (7th Cir.1992), *petition for cert. filed*, 61 U.S.L.W. 3112 (U.S. Aug. 3, 1992) (No. 92–216); *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir.1989). *But see United States v. Garcia*, 956 F.2d 41, 43–44 (4th Cir.1992) (parol evidence rule should not be rigidly applied in plea agreements because the defendant's constitutional rights are implicated.).

5. *See also United States v. Carter*, 454 F.2d 426, 428 (4th Cir.1972) (en banc) ("[T]he honor of the government, public confidence in the fair

administration of justice, and the efficient administration of justice in a federal scheme of government" should be considered in interpreting plea agreements.).

6. *See United States v. Bowler*, 585 F.2d 851, 854 (7th Cir.1978) (construing plea to include government's implicit promise to consider specified factors in sentencing when other construction would have rendered contract language "mere surplusage" and defendant relied upon such a construction when entering the plea).

the agreement if that had not been his understanding.

As the magistrate judge noted, there appears to be some tension in the writings of our colleagues in the Second and Fourth Circuits about the effect of ambiguity in a plea agreement.[7] However, because we agree with the district court that the agreement in this case unambiguously bound only the District of Colorado, the nuances of that tension are not relevant to our resolution of the present case. Mr. Ingram correctly points out that the government cannot avoid its obligations by interpreting plea agreements with a "rigid literal approach" to the language. *United States v. Fields*, 766 F.2d 1161, 1167 (7th Cir.1985) (quoting *United States v. Bowler*, 585 F.2d 851, 854 (7th Cir.1978)). Nonetheless, as the district court determined, the plea agreement negotiated by AUSA Hobson and Mr. Shih is unambiguous on its face with respect to whether the government promised Mr. Ingram that it would not prosecute him anywhere for any of his criminal activity connected with the Miller Organization. The agreement stated as clearly as possible that the agreement only bound the United States Attorney's Office for the District of Colorado:

> [T]he United States Attorney's Office for the District of Colorado ... further agrees not to file any additional criminal charges in the District of Colorado which are known to this office arising from Mr. Ingram's criminal activities in the District of Colorado.

R. 133 Ex. 2. Indeed, as the government notes, the agreement contains the very language that the Fourth Circuit prescribed in *Harvey* to cure ambiguity:

> Had the agreement said what it could easily have said, "the Government further agrees that the defendant will not be prosecuted in the Eastern District of Virginia (or 'by the office of the United States Attorney for the Eastern District of Virginia') ...," it would have said unambiguously what the Government contends it unambiguously said as actually written.

791 F.2d at 301.

### 2. Overreaching

 Mr. Ingram also argues that, even if the final agreement did not expressly bind *all* United States Attorney offices, he was induced to sign the agreement by suggestions or implication that it would have that effect. Mr. Ingram states that he never would have entered the agreement had he known that it left him exposed to subsequent prosecution for his involvement in the FCI Oxford conspiracy. Mr. Ingram places great emphasis on AUSA Hobson's agreement to the insertion of the "arising from" language. He argues that this change in language implied that he would be protected from prosecution for activity that occurred anywhere, so long as it "arose from" his Colorado criminal activity. For the reasons set forth in the following discussion, we believe that the record amply supports the district court's conclusion that Mr. Ingram "was not muscled into executing the plea agreement" and that the government's decision to prosecute in the Western District of Wisconsin did not "constitute overreaching" and "would not undermine the public's confidence in the fair administration of justice." Mem. Op. at 1–2.

Mr. Ingram argues that it is fundamentally unfair to allow the subsequent prosecution in Wisconsin because AUSA Hobson knew that a prosecution was imminent in the Eastern District of Wisconsin but only told Mr. Ingram that another "investigation" was pending and there was merely a possibility that it would lead to prosecution. Furthermore, Mr. Ingram contends that,

---

**7.** In *United States v. Harvey*, 791 F.2d 294, 301–03 (4th Cir.1986), the Fourth Circuit held that a plea agreement that is ambiguous as to whether it binds only the prosecuting district must be resolved against the government to bind the United States in all districts. In *United States v. Annabi*, 771 F.2d 670, 672 (2d Cir.1985) (per curiam), the Second Circuit held: "A plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction." *See also United States v. Russo*, 801 F.2d 624 (2d Cir.1986); *United States v. Alessi*, 544 F.2d 1139 (2d Cir.), *cert. denied*, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976).

because all of his phone calls were to Miller Organization members in Colorado, AUSA Hobson had sufficient evidence to have charged Mr. Ingram with the FCI Oxford conspiracy in the same indictment. Mr. Ingram further suggests that AUSA Hobson deliberately misled him by telling him that the authorities in the unidentified jurisdictions "were not especially interested in pursuing prosecution against [him]." Affidavit of Theodore Shih, R. 133 Ex. 1 ¶ 3.

At the outset, we note that Mr. Ingram cites no authority suggesting that the government must inform a criminal defendant about all known evidence concerning non-charged offenses, so that the defendant can seek to negotiate the preclusion of prosecution on those offenses. Nor do the facts of record support his allegation. When the plea agreement was executed, two years had passed since Colorado AUSA Hobson and Eastern Wisconsin AUSA Johnson had "agreed" that the FCI Oxford conspiracy would be prosecuted in one district or the other. AUSA Hobson testified that, at the time of his negotiations with Mr. Ingram and Mr. Shih, neither the Colorado nor the Wisconsin United States Attorney officers were "especially enthusiastic" about prosecuting the FCI Oxford conspiracy. Tr. vol. 4, at 77. Although AUSA Hobson had access to the tapes that directly implicated persons suspected in the Colorado conspiracy, he had not personally listened to the tapes. Additionally, he was not certain whether there was other evidence, or what the status of the investigation was with respect to FCI Oxford conspirators such as Patrick Coyle who had no direct link to the events under investigation

in Colorado. *Id.* at 73–74. Thus, it does not appear that AUSA Hobson deliberately misled Mr. Ingram when he told him that the other investigation was ongoing.[8]

AUSA Hobson explicitly told Mr. Shih that he was neither willing nor authorized to bind any federal district other than the District of Colorado. R. 125 at 49. Indeed, Mr. Shih stated at his deposition that he did not believe that the plea agreement foreclosed prosecution of Mr. Ingram in connection with the investigations that AUSA Hobson had mentioned were underway in other districts. R. 133 at 54–55. Mr. Shih was unaware of Mr. Ingram's criminal activity at FCI Oxford. Mr. Ingram admitted that, during the course of the plea negotiations, he was not thinking of his involvement at FCI Oxford: "I wasn't really thinking about Wisconsin to tell you the truth." R. 125 at 190.[9]

Furthermore, as the district court also stated, Mr. Ingram had ample incentive to enter into the Colorado plea agreement without a promise of total immunity for all criminal activity related to the Miller Organization. In a multiple count indictment, Mr. Ingram was charged with a large-scale conspiracy that straddled the effective date of the United States Sentencing Guidelines. By pleading guilty to the only pre-Guideline charge, Mr. Ingram avoided the Guidelines' automatic sentence enhancements.[10] Thus, the district court was on solid ground in concluding that Mr. Ingram was not induced to enter into the plea agreement by an understanding that it would insulate him from all further liability for his criminal activity at FCI Oxford.

8. The Seventh Circuit rejected a similar challenge in *United States v. Strawser*, 739 F.2d 1226, 1230 (7th Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984). In *Strawser,* the defendant claimed that his plea agreement impliedly covered all offenses of which the government had knowledge of at the time of the plea. The court rejected this argument, finding *no evidence that the government had* "detailed and specific knowledge" of the later charges when the plea was entered. *Id.* at 1230.

9. As the district court noted, Mr. Ingram had no reason to think that his criminal activity at FCI Oxford was known to the United States Attor-

ney's Office for the District of Colorado. Thus it seems unlikely that Mr. Ingram believed the plea agreement extended to his activities in Wisconsin.

10. Methamphetamine is a Schedule II controlled substance. 21 U.S.C. § 812 (1988). Under the Guidelines, Mr. Ingram's sentence would be effected by mandatory minimum enhancements for the quantity of drugs involved, his criminal history, and engaging in drug trafficking while incarcerated, on parole, or on probation. U.S.S.G. §§ 2D1.1(a)(3), 4A1.1 (1991).

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.