In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1236

United States of America,

Plaintiff-Appellee,

v.

Christopher B. Matchopatow,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00-CR-31--Charles N. Clevert, Judge.

Argued June 7, 2001--Decided August 3, 2001


  Before Coffey, Easterbrook, and Rovner,
Circuit Judges.

  Coffey, Circuit Judge.  On March 27,
1998, a Menominee Tribal police officer
discovered the body of Mary Tomow, a
Menominee Indian, along Spirt Rock Road
on the Menominee Indian Reservation
located in Wisconsin. After an
investigation, the defendant was charged
in a one-count indictment with the murder
of Mary Tomow. On September 19, 2000,
Christopher Matchopatow pleaded guilty to
one count of second degree murder, 18
U.S.C. sec. 1111(a)./1 Pur-suant to the
plea agreement, Matchopatow waived, among
other things, the right to challenge his
conviction or sentence in any appeal or
post-conviction proceeding, with some
limited exceptions. The district court
imposed a 9-level upward departure in
offense level, pursuant to U.S.S.G. sec.
5K2.8 due to the brutality and heinous
nature of  Matchopatow's crime, though
the government had recommended only a 5-
level upward departure. Matchopatow now
appeals, despite the waiver in his plea
agreement.

I.  Factual Background
  On September, 27, 1998, Menominee Tribal
Police Officer Robert Summers discovered
the partially clothed body of Mary Tomow
along Spirt Rock Road on the Menominee
Indian Reservation approximately 30 yards
off the gravel road in a heavily wooded

area. Tomow's body had also been severely burned, with the burned area being confined to her upper torso, neck and head. The burns were sufficiently severe to expose the bone along Tomow's shoulder. A medical autopsy revealed that she had multiple lacerations to the face and nose and a fracture of the nasal bone. In addition, Tomow suffered a depressed and fractured skull. According to the medical examiner, the cause of Tomow's death was blunt-force trauma to the head.

The investigation revealed that Matchopatow, also a Menominee Indian, had been at the War Bonnet Tavern with several members of Tomow's family during the early morning hours of March 21, 1998. After leaving the tavern, Matchopatow had driven home several members of Tomow's family. Sometime later that night, Matchopatow returned to Tomow's residence. Matchopatow informed Mary Tomow that he had some beer in his vehicle and asked her to accompany him to share the beers. Tomow agreed and, unfortunately, did not return from the excursion with Matchopatow. Not surprisingly, the government's investigation focused on Matchopatow, even though when first interviewed he denied having had any contact with Tomow the night of her disappearance.

Despite Matchopatow's initial denial that he had been with Tomow the night of her disappearance, the government continued to investigate him. Pursuant to a grand jury subpoena, FBI agents submitted Matchopatow's DNA to an FBI crime laboratory, along with semen samples taken from Tomow's body. The government also tested several other suspects, but the DNA analysis revealed that the semen taken from Tomow's body matched only Matchopatow.

Ultimately Matchopatow was arrested in the spring of 2000. Shortly after his arrest, Matchopatow gave a statement admitting to the murder of Tomow. According to Matchopatow, he and the deceased had driven to Spirit Rock Road, drank the beer, and engaged in consensual, unprotected sex. Matchopatow claimed that afterwards Tomow stated that she could have him charged with sexual assault or rape. Matchopatow told the government that Tomow's threat upset him

and he retrieved a tire iron from the truck of his vehicle. He stated that when Tomow approached him he struck her about her head three or four times.

Even though Matchopatow had struck Tomow several times, he reported that she had still been alive when she fell to the ground for she had made noises and had difficulty breathing. Matchopatow admitted that he smoked several cigarettes for approximately ten or fifteen minutes while standing over Tomow, as she lay dying. After Tomow died, Matchopatow dragged her by her ankles into the woods and left her body. He claimed not to remember how the victim's body was burned. The government's investigation revealed that some type of accelerant was placed upon the victim's body and ignited. After hiding the body, Matchopatow drove home and disposed of the tire iron along the roadside. The day after Tomow's murder, Matchopatow stated that he had remained at home, rather than having gone to work, so that he could clean out his car and remove any trace of Tomow's presence.

After his motion to suppress his confession was denied, Matchopatow agreed to plead guilty to one count of second degree murder, 18 U.S.C. sec. 1111(a). The plea agreement provided, among other things, that the government "will recommend a 5-level upward departure from the applicable sentencing guideline range based on the brutality and heinous nature of the offense, the use of a dangerous weapon, and the mutilation by burning of the corpse pursuant to [U.S.S.G.] sec. 5K2.8." The plea agreement further acknowledged that the defendant understood and agreed "that neither the sentencing court nor the United States Probation Office is a party to or bound by the agreement . . . [and that] the sentencing court will make its own determination regarding any and all issues relating to the application of the sentencing guidelines." Most importantly, Matchopatow agreed in the plea agreement to waive the right to challenge his conviction or sentence in any appeal or post-conviction proceeding except one based on a punishment in excess of the statutory maximum, the sentencing court's reliance on any constitutionally impermissible factor, or ineffective assistance of counsel. The government

reserved the right to support any decision made by the district court, even if that decision differed from the government's recommendation.

The district court accepted Matchopatow's plea. But rather than follow the government's recommendation to give Matchopatow a 5-level upward departure under sec. 5K2.8, the court gave him a 9-level upward departure. The court noted that the case was:

well outside the heartland of what would ordinarily be a case of second degree murder. Mr. Matchopatow's use of a tire iron which fractured Miss Tomow's skull, his use of an accelerant which charred the upper portions of [her] body and face, and [his] concealment of the body after dragging it into the woods warrants a very stiff penalty which would be consistent with the crime which was committed. The guideline range which I described [108 to 135 months] cannot adequately address this type of brutal, heinous, stomach retching crime . . . . For each one of the matters which I've touched upon . . .  the Court is going to depart upward three levels for a total of nine levels in this particular case.

As a result of the court's 9-level upward departure, Matchopatow's adjusted offense level was 39, which together with his criminal history category of II, yielded a guideline imposed sentencing range of 292 to 365 months. The district court then asked whether the parties took any exception to the court's finding.

Matchopatow's counsel admitted that an upward departure was warranted, but asked the court to accept the agreement reached between the parties and impose only a 5-level upward departure. In short, counsel suggested that the penalty with the 9-level upward departure was as stiff as the penalty for first degree murder, thus depriving Matchopatow of the benefit of his plea.

The government asked to respond, and the district court allowed it to do so. Initially, the government explained that the statute for first degree murder imposed a mandatory term of life imprisonment, and thus even with the court's imposition of a 9-level upward departure, Matchopatow still received a

lesser sentence by pleading guilty to second degree murder. The government also concluded briefly that "the Court's rationale and basis for its upward departure is correct and the government will support that position." The district court then sentenced Matchopatow to a term of 360 months imprisonment to be followed by 5 years of supervised release. Matchopatow now appeals, arguing that the district court's imposition of a 9-level upward departure was an abuse of discretion.

## II. Discussion

It is difficult to conceive what the basis of Matchopatow's argument is in view of the fact that he signed a waiver in which he expressly and unambiguously waived his right to challenge the sentence imposed. United States v. Jemison, 237 F.3d 911, 917 (7th Cir. 2001); United States v. Woolley, 123 F.3d 627, 631-32 (7th Cir. 1997). He admits that the plea agreement was knowingly and voluntarily made. United States v. Joiner, 183 F.3d 635, 644 (7th Cir. 1999) (deeming right to appeal waived where defendant did not contend that the plea was not knowingly or voluntarily made); United States v. Cavender, 228 F.3d 792, 803 (7th Cir. 2000). Normally, that should be the end of Matchopatow's case, and his appeal dismissed.

Matchopatow attempts to preserve his right to appeal by claiming that the government breached the plea agreement. In short, Matchopatow contends that when the government told the district court that it supported its decision to impose a 9-level upward departure, it breached the plea agreement, which required the government to recommend a 5-level departure.

But there are numerous problems with Matchopatow's argument. We note initially that he never objected to the court during sentencing and notified the trial judge that he believed the government had violated the plea agreement. Matchopatow's failure to raise the issue of the government's alleged breach during sentencing limits our review to one for plain error. United States v. Hicks, 124 F.3d 376, 378 (1997); United States v. Flores-Sandoval, 94 F.3d 346, 352 (7th Cir. 1992); United States v. Phillips, 37

F.3d 1210, 1215 (7th Cir. 1994).

This is not all, for Matchopatow never raised the government's alleged breach in his initial brief to this court. Instead, he raised only the issue of whether the district court abused its discretion in imposing a 9-level, as opposed to the recommended 5-level, upward departure. Only after the government had pointed out that Matchopatow waived his right to appeal, did he suggest in his reply brief that the government had breached the plea agreement. It is well recognized that arguments not raised in the proceedinguntil the reply brief are waived. United States v. Turner, 203 F.3d 1010, 1019 (7th Cir. 2000). But whether we consider Matchopatow's failure to timely raise his claim as a forfeiture or a waiver matters little, for we cannot fathom even a scintilla of support for his argument that the government broke its promise to him. Indeed, at oral argument, Matchopatow's counsel admitted that he could point to no language in the plea agreement that the government failed to perform.

"Plea agreements are contracts, and their content and meaning are determined according to ordinary contract principles." United States v. Schilling, 142 F.3d 388, 394 (7th Cir. 1998) (quoting United States v. Ingram, 979 F.2d 1179, 1184 (7th Cir. 1992)). "The government must fulfill any promise that it expressly or impliedly makes in exchange for a defendant's guilty plea." Id. at 395. Although the government is to be held to the literal terms of the plea agreement, id., we will not require the government to do more than it intended. See United States v. Williams, 198 F.3d 988, 992 (7th Cir. 1999); Schilling, 142 F.3d at 395; United States v. Jimenez, 992 F.3d 131, 134 (7th Cir. 1993). Indeed, in our civil contract jurisprudence, we consistently have held that we will not ignore the plain language of the contract where there is no ambiguity. See, e.g., River v. Commercial Life Ins. Co., 160 F.3d 1164, 1169 (7th Cir. 1999); Heller v. Equitable Life Assurance Soc. of the United States, 833 F.2d 1253, 1256 (7th Cir. 1987).

In determining whether the government broke its promise, we look to "the parties' reasonable expectations upon

entering the agreement." Schilling, 142 F.3d at 395. All the government promised to do in this case was to make a sentencing recommendation. The plea required the government to "recommend a 5-level upward departure from the applicable sentencing guideline range . . . pursuant to [U.S.S.G.] 5K2.8," and further acknowledged that "the sentencing court will make its own determination regarding any and all issues relating to the application of the sentencing guidelines." The government fulfilled its promise, and the sentencing court disagreed with that recommendation. Matchopatow insists that the government broke the spirit of this promise when it stated that it "will support [the district court's] position." But despite Matchopatow's cry of foul, the government never made a promise to stand mute in the face of efforts on behalf of Matchopatow to challenge the sentencing court's findings. Indeed, the plea agreement specifically contemplated the opposite-- that the government could take any position consistent with the sentencing court's findings. Cf. United States v. Brooks, 708 F.2d 1280, 1282 (7th Cir. 1983) (holding that a government promise to refrain from making a sentencing recommendation does not preclude the government from opposing the defendant's efforts to reduce his sentence after the sentence has been handed down).

"Defendants who appeal from sentences following plea agreements always point to unanticipated and unwelcome developments." Woolley, 123 F.3d at 637. This case is no different. In this case it was the judge's independent decision to impose a 9-level upward departure, as opposed to the recommended 5-level departure. The trial judge gave reasons for his decision, noting that he was imposing a 3-level departure for each of three factors--the heinous nature of the crime, defendant's mutilation of the body after the murder, and defendant's concealment of the body. The plea agreement clearly specifies the government's obligations, and to accept Matchopatow's argument that the government breached that agreement would force us to revise the plea agreement and strain to find that the government assumed an obligation to convince the sentencing court to reconsider its decision where it never expressly did so.

An unanticipated departure on the part of the sentencing court simply does not support a claim that the government broke its promise. We refuse to revise the written contract to benefit either the government or the defendant.

Although plea agreements are not simply ordinary contracts and require the government to deal fairly and forthrightly with defendants, it is the "duty of defense counsel to examine carefully the contours of the plea agreement and to advise carefully the defendant as to those matters that are covered by the agreement and those matters that are not." United States v. Williams, 102 F.3d 923, 927 (7th Cir. 1996). Matchopatow was represented by counsel throughout the proceedings, and does not claim that he was unaware of the ramifications of his plea.

We hold that the government did not breach the terms of the plea agreement and that Matchopatow's waiver of his right to appeal is therefore binding and valid. Accordingly, we see no need to address the merits of his sentencingargument and DISMISS his appeal.

FOOTNOTES

/1 Federal jurisdiction was premised on the fact that the murder occurred on the Menominee Indian Reservation. See 18 U.S.C. sec. 1153; United States v. Olsen, 846 F.2d 1103, 1106 n.1 (7th Cir. 1988); United States v. Torres, 733 F.2d 449, 453-54 (7th Cir. 1984).