In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-1673

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JULIAN SALAZAR,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 88—**James B. Zagel**, *Judge.*

ARGUED MAY 2, 2006—DECIDED JULY 13, 2006

Before CUDAHY, RIPPLE, AND WOOD, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Julian Salazar, a leader of the Insane Deuces street gang, pleaded guilty to one count of possessing a firearm, which, as a felon, he may not do. 18 U.S.C. § 922(g). In exchange for his plea, the government agreed to recommend a sentence at the low end of the applicable range of the federal Sentencing Guidelines, provided that the district court accepted its calculated range of 108 to 120 months' imprisonment. Salazar argues that the government, in addressing the court, breached that agreement by paying only lip service to its recommendation while characterizing him as a cold-blooded killer willing to do anything to protect the gang. We disagree with Salazar and affirm the judgment of the district court.

The Insane Deuces street gang operates primarily in northern Illinois. In 2002, Salazar and other gang leaders grew suspicious that John Landeros, a gang member who had been caught with four ounces of cocaine but never charged, was a government informant. On September 15, 2002, Salazar and two other gang leaders arrived at another gang member's house to discuss the situation. Salazar ultimately ordered this gang member to make arrangements to kill Landeros. As it happened, however, Landeros was not working for the government, but—irony of ironies—the member Salazar ordered to kill Landeros was.

As directed, the government informant made preliminary arrangements to kill Landeros and wore a recording device during planning meetings with Salazar. At one meeting (where the recording device failed to work), Salazar instructed the informant to contact him before killing Landeros so that Salazar could obtain cocaine from the intended victim without paying for it. At a later meeting that was recorded, Salazar told the informant not to worry about killing Landeros because that was Salazar's "headache" as a leader of the gang. They also discussed whether a .22 caliber pistol would be adequate to kill Landeros. Shortly after this conversation, police arrested Salazar.

A grand jury indicted Salazar on one count of distributing cocaine and one count of being a felon in possession of a firearm. On June 21, 2004, he entered a blind guilty plea on the firearm charge. The government then agreed to drop the cocaine charge, but the parties could not agree on the Guidelines calculation. The government agreed that if the district court accepted its Guidelines calculation, it would seek a sentence at the low end of the Guidelines range. After applying enhancers for conspiracy or solicitation to commit murder and for being the organizer or leader of a criminal activity, the government concluded that the appropriate range fell between 108 and 120 months.

At the sentencing hearing, the government stated:

> The Government, pursuant to the agreement reached with defense counsel and the defendant's plea agreement as has been previously noted to the Court, would recommend that the defendant be sentenced at the low end of that Guideline range, one hundred eight to one hundred twenty. That is an appropriate sentence in this case, your Honor. This is a cold-blooded killer who hires others to go out and kill fellow gang members when he thinks they are cooperating with the police. When he thinks his way of life, the gang life, is in jeopardy. That is the tapes, the tapes make that very, very clear. He casually discusses it without even blinking an eye. That is an appropriate sentence in this case and we urge that you sentence him accordingly.

(R., Sentencing Hr'g 100, Feb. 9, 2005.) The district court accepted the government's presentation but sentenced Salazar to 120 months—the statutory maximum for the firearms charge. Salazar argues that the government breached its plea agreement; his theory is that, in describing him as a cold-blooded killer, the government effectively urged a higher sentence while paying lip service to the agreed plea.

Salazar argues for the first time on appeal that the government breached its plea agreement. We accordingly review the district court's judgment for plain error. *United States v. Matchopatow*, 259 F.3d 847, 851 (7th Cir. 2001); *United States v. D'Iguillont*, 979 F.2d 612, 614 (7th Cir. 1992). This standard is remarkably demanding; in order to prevail, Salazar must show: (1) that there was error; (2) that the error was plain or obvious; (3) that the error affected his substantial rights; and (4) that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 734-36 (1993); *United States v. Sharp*, 436 F.3d 730,

734 (7th Cir. 2006). In the context of an arguably breached plea agreement, Salazar must show that but for the breach, his sentence would have been different. *D'Iguillont*, 979 F.2d 614.

The first step of our analysis is to consider whether the government did in fact breach its plea agreement with Salazar. Since plea agreements are contracts, their content and meaning are determined according to ordinary contract principles. *United States v. Ingram*, 979 F.2d 1179, 1184 (7th Cir. 1992). A substantial breach is required before the government is considered in breach of its plea agreement. *United States v. Hauptman*, 111 F.3d 48, 51-52 (7th Cir. 1997).

It is well settled that the government must fulfill any promises it makes in exchange for a defendant's guilty plea. *Santobello v. New York*, 404 U.S. 257, 262 (1971); *Matchopatow*, 259 F.3d at 851. The terms of these promises, however, will be read according to their natural meaning. *United States v. Williams*, 198 F.3d 988, 992 (7th Cir. 1999). Salazar argues that the government failed to fulfill its promises by only nominally honoring the terms of the agreement while simultaneously making arguments that substantially undercut its sentencing recommendation—all in an attempt to induce the judge to impose a sentence longer than the one agreed to.

We have not earlier had the opportunity to consider the status of a plea agreement in a case like this one. Other circuits faced with similar circumstances have concluded that undercutting a sentencing recommendation may rise to the level of a breach of an agreement. *See, e.g.*, *United States v. Vaval*, 404 F.3d 144, 152-54 (2d Cir. 2005) (concluding that the government breached its plea agreement when it set forth an argument justifying an upward departure despite provisions prohibiting it from doing so); *United States v. Gonczy*, 357 F.3d 50, 53-54 (1st Cir. 2004) (conclud-

ing that the government breached its plea agreement when it argued for the agreed-upon term but then noted that "the defendant at a minimum deserves what the Guidelines provide for and those are his just deserts"); *United States v. Saling*, 205 F.3d 764, 765-67 (5th Cir. 2000) (concluding that the government breached its plea agreement when an attorney other than the one who negotiated the plea stated that she "just encourage[s] the Court to consider those factors when the Court determines whether this should be a concurrent or consecutive sentence" when the government had agreed not to oppose concurrent sentences).

These conclusions were, we think, quite reasonable. Plea agreements only work when both sides adhere to their promises. Although the court of appeals is generally hesitant to micromanage the sentencing process, it is especially important that the government recognize its obligations with respect to guilty pleas. *See, e.g.*, *Ingram*, 979 F.2d at 1184. Permitting the government to perform by half-heartedly requesting a light sentence while simultaneously arguing forcefully that a defendant is vicious—and failing to explain that its sentencing recommendation is consistent with its characterization of him—does not serve the broader purposes behind plea agreements (such as fairness and efficiency).

Salazar's case is close—closer than some decided in the other circuits. It is troubling that it is not wholly irrational to interpret the government's statements as mere lip service to the terms of the agreement. While the government does have an obligation under 18 U.S.C. § 3661 to bring all information relevant to sentencing to the district court's attention, the statement at issue here could easily be interpreted as contradicting the specific sentencing recommendation. In some circumstances, it may be appropriate to suggest a lighter sentence for a "cold-blooded killer." But since such a recommendation generally seems an anomaly,

some explanation is in order. However, the simple fact here is that the government did in fact request that the district court impose a low-end Guidelines sentence and noted its obligation to do so more than once during the sentencing hearing. (R., Sentencing Hr'g 93, 100, Feb. 9, 2005.)

Additionally, although it characterized Salazar as a less-than-upstanding citizen, the government did not request a higher sentence or remind the judge that he need not abide by the agreement. In fact, the government consistently commented that the low-end Guidelines sentence was appropriate. The facts here are close enough to conclude that the government did not *substantially* violate the terms of its agreement. Our conclusion must be that the government honored its agreement with Salazar.

Even if the government had breached the plea agreement, however, Salazar still cannot overcome the requirements of plain-error review. Reversal on the basis of plain-error review is justifiable "only when the reviewing court is convinced that it is necessary in order to avert an actual miscarriage of justice." *D'Iguillont*, 979 F.2d at 614. A defendant wishing to establish plain error must show that "but for the breach of the plea agreement his sentence would have been different." *Id.*[1] Salazar is unable to point to anything that persuasively suggests that the district court would have imposed a different sentence but for the government's argument that he is cold-blooded. The district court noted that it was disturbed by Salazar, a man who seemed

---

[1] Salazar argues that a *D'Iguillont*-type approach is appropriate only where the district court did *not* follow the government's sentencing recommendation that arguably breached a plea agreement. This argument is unduly narrow; the Court made no suggestion of this type of limitation in the case. The opinion merely states that "[n]othing in the record indicates that the government's objection caused a different outcome at his sentencing hearing." 979 F.2d at 614.

to have delusions about his abilities and about his power. (R., Sentencing Hr'g 102, Feb. 9, 2005.)[2] And the judge further made statements indicating that he would have departed upwards even if the Guidelines had limited his sentencing discretion in the case before him. (R., Sentencing Hr'g 102, Feb. 9, 2005.) Nothing suggests that the district court would have imposed a lower sentence if the government had abided less ambiguously by the plea agreement in the manner Salazar wished.

Accordingly, we AFFIRM the judgment of the district court.

---

[2] At the conclusion of the sentencing hearing, the district court judge stated:

> The thing that I find most distressing about the facts of this case and the character of the defendant is not the facts of what he did, which are bad enough, but the character and disposition he showed in the tapes. Mr. Salazar belongs to . . . a uniquely dangerous class of individuals; who . . . decide that their profession is to be the mastermind of a criminal enterprise—to give orders, to expect them to be obeyed, to determine life and death. . . . This is a man, I think, who had delusions about his power, about his control and about his abilities; none of which, if you are in a lawful enterprise, with bear lethal consequences. But in the field he chose, they do. I think it will take him a lot of time to understand just what his limitations are.

(R., Sentencing Hr'g 102, Feb. 9, 2005.)

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*