# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-4190

MICHAEL L. JOHNSON,

*Petitioner-Appellant,*

*v.*

JOHN BETT, WARDEN,

*Respondent-Appellee.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99 C 412—**J.P. Stadtmueller**, *Judge.*

———————

No. 03-2245

DALE BASTEN,

*Petitioner-Appellant,*

*v.*

DANIEL BERTRAND,

*Respondent-Appellee.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99 C 411—**Aaron Goodstein**, *Magistrate Judge.*

———————

ARGUED SEPTEMBER 23, 2003—DECIDED NOVEMBER 20, 2003

———————

Before POSNER, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* These petitions for writs of habeas corpus require us to again look at the gruesome murder of Thomas Monfils at the hands of some of his coworkers at the James River Paper Mill in Green Bay, Wisconsin. We have previously set out the facts in a civil rights case, *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998), and two petitions for habeas corpus, *Piaskowski v. Bett*, 256 F.3d 687 (7th Cir. 2001), and *Moore v. Casperson*, 345 F.3d 474 (7th Cir. 2003). We repeat them here only as necessary to resolve these appeals, which we have consolidated.

On November 10, 1992, the Green Bay Police Department received an anonymous tip that James River employee Keith Kutska was planning to steal a piece of electrical cord. That information was passed on to the company, and when Kutska was leaving after his shift, he was stopped by a security guard who asked to search his duffel bag. Kutska refused to allow the search and, as a result, was suspended without pay for 5 days.

Kutska found out that the police had been tipped off by an anonymous call, and he set out to find out who the caller was. Meanwhile, fearing being found out, Monfils, who had called in the tip, begged the police not to give Kutska access to the tape. But in a bureaucratic blunder, Kutska was given the tape, which allowed him to identify Monfils' voice.

Kutska brought the tape to the mill on November 21 and played it for anyone who would listen, including petitioners Michael Johnson and Dale Basten.

At 7:34 the same morning the tape was being played, Monfils performed a routine task known as a "turnover," which is essentially changing a paper roll. A minute later, an altercation involving Monfils and a number of other workers occurred near a water fountain. Monfils was

attacked and beaten until he was unconscious, lying in a ball on the floor.

At trial, there was testimony about the encounter at the water fountain from James Gilliam, a jailhouse informant, who was Reynold Moore's cellmate. Gilliam said that Moore told him that he and others decided to scare Monfils. Kutska hit Monfils in the face and Monfils went into a cuddle on the floor. Moore said he attacked Monfils "like everybody else." According to Gilliam's account of what Moore said, the attackers then went back to work, and Moore was shocked to learn that Monfils was found dead.

Not everyone immediately went back to work, however, because about 5 minutes later, mill worker David Wiener saw Basten and Johnson in an area which connects the paper machines with the vat that supplies pulp to the machines. Johnson was walking backwards 5 or 6 feet in front of Basten. The men appeared to be carrying something toward the pulp vat.

At 7:45 Kutska and Moore, another of the convicted men, were in an area of the plant with Michael Piaskowski. Kutska told Piaskowski to alert a supervisor that Monfils was missing. After Piaskowski notified the supervisor, a search was begun. The next day, Monfils' body was found at the bottom of the pulp vat. A heavy weight was tied around his neck. The coroner determined that he died by asphyxiation due to the aspiration of paper pulp, which, of course, means he was alive when he was thrown into the vat to which he was carried, if Wiener's account is true, by Johnson and Basten.

A break in the case over 2 years later allowed the police to charge six men with first-degree intentional homicide, as a party to a crime. In April 1995, Brian Kellner, another mill worker, told police that Kutska admitted that the six defendants and another man confronted Monfils near the water fountain after the 7:34 turnover. All six men

were convicted after a joint trial. The Wisconsin Court of Appeals affirmed the convictions and the Wisconsin Supreme Court denied review. Later, Piaskowski's petition for a writ of habeas corpus was granted in a decision we affirmed in the case cited above. Basten and Johnson are hoping for the same good fortune in their petitions for writs of habeas corpus.

Both men contend that the evidence was insufficient to sustain their convictions. In addition, Johnson argues that he was denied his right to present a defense, specifically an expert witness. Basten complains of the admission of hearsay statements of a codefendant, the failure to sever his trial from the others, the abridgement of his right to confront witnesses and present evidence, and the denial of his request for a new trial based on newly discovered evidence.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d)(1), habeas relief may be granted if the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" In *Williams v. Taylor*, 529 U.S. 362, 405, 407 (2000), the Court explained that a state court decision is "contrary to" Supreme Court precedent if the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. An unreasonable application of Supreme Court precedent occurs when "the state court unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle . . . to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." To be unreasonable, the decision of the state court must not be simply incor-

rect or erroneous, it must have been "objectively unreasonable." *Wiggens v. Smith*, 123 S. Ct. 2527 (2003).

The clearly established federal law which applies to the petitioners' claims that the evidence is insufficient to sustain their convictions is that set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Jackson*, at 319, holds that due process is satisfied if, viewing the evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." For purposes of the habeas petitions, we must determine whether the Wisconsin Court of Appeals' decision that a rational jury could have convicted Basten and Johnson was an objectively unreasonable application of the *Jackson* standard.

As we said, we have previously considered Piaskowski's claim that the evidence was insufficient to convict him, and we agreed that it was. We have also glanced at Moore's claim in the context of whether he could show prejudice for his procedural default in not presenting the issue to the Wisconsin Supreme Court. *Moore*, 2003 WL 22227975. His case, we said, was different from (and more compelling than) Piaskowski's.

Turning to the evidence against Basten and Johnson, we find considerably more evidence than existed against Piaskowski. And, as the respondent points out, the State's theory of the case against Basten and Johnson was different from that against Piaskowski. As to Piaskowski, the theory was that he participated in a conspiracy to kill Monfils but did little else to cause the death. By contrast, the theory as to Basten and Johnson was that they actually committed the murder by throwing Monfils into the pulp vat.

The evidence on which the Wisconsin Court of Appeals relied includes that set out above regarding the tape of Monfils' call to the police. The court considered the testi-

mony from Kellner about his conversation with Kutska and the testimony of Wiener that he saw the two men carrying something from the location of the beating to the pulp vat. Johnson was walking backwards about 5 or 6 feet ahead of Basten—the approximate length of Monfils' body. There was evidence that after the body was found, Basten began acting strange and talked about how he would have disposed of the body. There was also evidence that Basten approached Wiener on several occasions to find out what he knew about the incident. The court of appeals determined that the jury could reasonably infer that Basten's curiosity about what Wiener had seen was rooted in his fear that his involvement in carrying the body was observed. Basten also had a threatening conversation with Connie Jones, an employee who had listened to the tape of Monfils' call to the police and who said that before she heard the tape, she saw Monfils seated by a machine and that Kutska pointed him out to the others while the tape was playing at about 7:30 a.m. Also, Basten told his employer that Monfils could have been kicked in the groin even though that information had not been made public. Basten was reported to have called Wiener a "fuckin' squealer." Basten was overheard saying that he should have left town when the police started to question him because now they knew for a fact that "we did the shit." When he was interrogated, he started to cry, and in response to an interrogator's statement that "you didn't mean to kill Tom Monfils, did you," he said no.

There was evidence that Johnson was with Basten at least one of the times he talked with Wiener, and Johnson told coworkers that Monfils got what he deserved. Also, the jury could have relied on inconsistencies in Johnson's statements following the murder. Additionally, the jury could infer that Basten and Johnson carried Monfils and that they were the ones who tossed him in the vat. We cannot conclude that the determination that a rational jury

could have convicted Basten and Johnson based on this evidence was an objectively unreasonable application of *Jackson*.

Next, the defendants present claims that the exclusion of certain evidence violated their constitutional rights, including the right to present a defense. The question for us is whether the exclusion of this testimony violated the Constitution in a manner clearly prohibited by the Supreme Court. We must start with the proposition that the Constitution recognizes the right of a criminal defendant to present evidence in his defense. *Chambers v. Mississippi*, 410 U.S. 284 (1973). That right, however, is not unlimited and is subject to reasonable restrictions. *Taylor v. Illinois*, 484 U.S. 400 (1988). The states have broad latitude to establish rules excluding evidence so long as the rules are not arbitrary or disproportionate to the purpose they are designed to serve. The exclusion of evidence is unconstitutionally arbitrary or disproportionate only in circumstances in which it has infringed on a weighty interest of the accused. *Rock v. Arkansas*, 483 U.S. 44 (1987).

Both Basten and Johnson complain about the exclusion of part of the testimony of Dr. Edward Geiselman, a psychologist. Basten wanted to undermine the testimony of Wiener, who said he saw Basten and Johnson carrying something to the area of the pulp vat. Wiener did not come forward immediately with this observation. Rather, he said that his memory of seeing Basten and Johnson suddenly returned May 15, 1993, when, in a drunken, depressed, and paranoid state at a wedding, he heard the name of a person he did not know who had nothing to do with the Monfils case. Somehow this reference jogged his memory.

To counter that claim, Basten called Dr. Geiselman as a witness. Dr. Geiselman was allowed to testify to suggestive

investigative techniques on memory; that is, that false memories can be constructed by techniques that posit certain facts as true so that a witness erroneously believes that what he had been told by an interviewer is what he actually remembers. But certain evidence Basten wanted to elicit was excluded. In his offer of proof regarding the excluded evidence, Basten said that Dr. Geiselman would be able to testify about the circumstances in which repressed memory was found to occur in clinical studies and about how Wiener's claim of repressed memory stacked up with other cases.

The evidence was excluded under Wis. Stat. § 904.03, which precludes the admission of evidence whose probative value is outweighed, for instance, by the danger of confusing or misleading the jury, or by considerations of undue delay or waste of time. In itself, this rule is not arbitrary or disproportionate to its purpose. And the exclusion of Dr. Geiselman's testimony can easily be supported under the rule. The jury would not need expert testimony to discredit Wiener's account of how he happened to remember seeing Basten and Johnson carrying something. The jury would likely conclude on its own that another explanation existed. The jurors could have thought that Wiener remembered seeing the men all along but was afraid to say anything because of the danger of retaliation—certainly a legitimate fear in the environment of this paper mill. When Wiener finally reported what he saw, he had to come up with an explanation of why he hadn't come forward earlier, so he made up the repressed memory story. The decision of the Wisconsin Court of Appeals on this issue is not contrary to or an unreasonable application of clearly established Supreme Court precedent.

Basten also contends that he was not allowed to dispute the testimony of witness James Charleston. Charleston testified that he and Basten were watching a television

news story that identified Wiener as a witness in the case against Basten. Charleston testified that during the news story, Basten mumbled "fuckin' squealer." At trial, the jury was aware that Wiener had been convicted of a crime unrelated to the Monfils murder and that he was in prison at the time of trial, but they did not know why. Basten wanted to testify that what he actually said was "killer," rather than squealer, and he wanted to explain to the jury why he would have said "killer"; that is, that Wiener had been arrested for killing his brother. The trial judge allowed Basten to testify that he had "said something else"; Basten was allowed to say that he uttered an epithet relating to the conduct with which Wiener was charged, but he was not allowed to say what Wiener's crime was.

The Wisconsin Court of Appeals affirmed the reasoning of the trial judge that the evidence was highly prejudicial and that its probative value, given what Basten was allowed to testify to, was low. The Wisconsin courts walked a tight line on this issue, but we cannot say that its resolution violated Basten's rights. Labeling Wiener a murderer could easily have prejudiced the jurors and caused them to think that perhaps Wiener was responsible for Monfils' death as well. Basten's testimony that he did not say "squealer" refutes the testimony without injecting confusing and prejudicial collateral evidence into the already lengthy proceedings.

Basten also disputes the propriety of admitting certain evidence. He contends that the admission of a statement Kutska made to Kellner at a Fourth of July party violated his Sixth Amendment and due process rights. Kellner testified that he and Kutska began drinking beer at noon and continued into the evening. During that time, Kutska told Kellner that the six men charged with Monfils' murder confronted Monfils near a drinking fountain, that someone waved the audio tape of the call to the police in

Monfils' face, and then hit Monfils on the back of the head. Kutska said he was "just standing back and watching the show progress and that then he had to leave" because there were problems with a piece of machinery. By the time he finished fixing the machine, Kutska said, "Tom was gone."

Basten argues that the statement was improperly admitted under an exception to the hearsay rule, as set out in Wis. Stat. § 908.045(4). The statute requires that, to be admissible, the statement must be against the declarant's interest and the declarant must be unavailable as a witness. The Wisconsin Court of Appeals found that the statement was admissible under § 908.045(4).

Whether it was error to admit the statement under the Wisconsin evidentiary rule is not our concern. Even before AEDPA, the Supreme Court has made clear that federal habeas corpus does not reach errors of state law. In conducting habeas review, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

What is our concern is whether the admission of the evidence was so unfair as to be a violation of the Due Process Clause or the Sixth Amendment's Confrontation Clause. We find it was not. Even when presumptively unreliable hearsay is admitted as substantive evidence, there is no violation so long as the declarant testifies as a witness and is subject to cross-examination. *California v. Green*, 399 U.S. 149 (1970); *Kentucky v. Stincer*, 482 U.S. 730 (1987); *Nelson v. O'Neil*, 402 U.S. 622 (1971). As we said in *Moore*, Kutska testified at trial, thus curing any error under *Bruton v. United States*, 391 U.S. 123 (1968). *See Moore*, 2003 WL 22227975.

Next, Basten argues that the denial of his severance motion violated his due process rights. That is so, he

says, because of the admission of Kutska's statements to Kellner and because the abundance of evidence against the other defendants could influence the jury to find him guilty.

We cannot find, however, that the decision regarding severance is contrary to or an unreasonable application of Supreme Court precedent. In fact, the Court has said that when a single crime is committed against a single victim in a single series of events by several defendants, a joint trial is not only acceptable but is desirable to promote greater reliability and consistency in the verdicts. *Buchanan v. Kentucky*, 483 U.S. 402 (1987). A misjoinder of defendants rises to the level of a federal constitutional violation only if it results in substantial prejudice to a defendant. *United States v. Lane*, 474 U.S. 438 (1986).

A defendant *might* be prejudiced if the jury heard evidence admissible against only one defendant, which would be inadmissible against him were he tried alone. That is the gist of what Basten says happened to him. But it is likely that if Basten had been tried alone, Kutska's statement to Kellner would have been properly admitted as a statement against interest. The bulk of the remaining evidence was relevant to all the defendants. And, of course, Wiener's statement that he saw Basten and Johnson carrying something toward the vat applies directly to Basten and Johnson. The defendants were in this conspiracy together. Trying them together allowed the State to present a chronology of what happened. Had each of the defendants been tried separately (and there is no reason to believe Basten is more entitled to a separate trial than any of the others), the story would have had to be presented six times. This case is a fairly good illustration of why joint trials are preferred.

Finally, Basten argues that his due process rights were violated because he was denied a new trial on the

basis of newly discovered evidence. That evidence is Kellner's partial recantation of his trial testimony and testimony from various inmates with whom Wiener was incarcerated, which allegedly cast doubt on his trial testimony.

On this claim, Basten must shoulder a heavy burden. Again he must show that the decision denying him a new trial was "contrary to" or an "unreasonable application of" Supreme Court precedent. And the Court has expressly held that "the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain*, 372 U.S. 293, 317 (1963). For claims based on newly discovered evidence to state a ground for federal habeas relief, they must relate to a constitutional violation independent of any claim of innocence. *Herrera v. Collins*, 506 U.S. 390 (1993). We have said that the "refusal to grant a new trial on the basis of newly discovered evidence is not actionable in habeas corpus." *Guinan v. United States*, 6 F.3d 468, 470 (7th Cir. 1993). And further, we have said that

> [w]here the "newly discovered evidence" consists of witness recantations of trial testimony or confessions by others of the crime, most courts decline to consider it in the absence of any showing that the prosecution knowingly proffered false testimony or failed to disclose exculpatory evidence, or that petitioner's counsel was ineffective.

*Coogan v. McCaughtry*, 958 F.2d 793, 801 (7th Cir. 1992).

Recently we decided that Kellner's "recantation" did not require a new trial for Reynold Moore. We again come to that conclusion. In his trial testimony, Kellner said that Kutska named all six defendants as involved in the confrontation with Monfils. At the postconviction hearing, he testified that Kutska said all were present immediately

before the confrontation but that Kutska named only Hirn and Moore specifically at the confrontation. Kutska did this by drawing a diagram and labeling where people were standing. While the diagram showed several people, only Hirn and Moore were named. The testimony, even if we could consider it as a basis for habeas corpus, does not clear Basten.

The second basis for Basten's claim is that there is new evidence that Wiener's trial testimony was false and that Wiener was actually the killer. As we said above, after the Monfils' murder, Wiener went to prison for reckless homicide in the killing of his brother. At the postconviction hearing in the present case there was testimony from Wiener's fellow inmates, who testified that Wiener told them he did not see Basten carrying anything. In addition, one inmate testified that Wiener asked what the State would be able to do if they found out he was the one who killed Monfils. Another inmate and a paralegal said that Wiener had not actually mentioned Monfils' name, but used a pronoun. The State argues that Wiener could have been talking about killing his brother. That is not an overly convincing explanation of the remark, but, on the other hand, because Monfils' murder was the result of a conspiracy, the fact that Wiener may have been involved in the murder does not mean that others were not involved.

Additionally, we note that there is nothing in the record to suggest that the prosecution had knowledge that either Kellner or Wiener might be testifying untruthfully at trial and, despite that knowledge, offered false testimony. There is no basis in this record to grant habeas relief based on this evidence.

The judgments of the district courts denying the writs are AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*