In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-2127 & 05-2220

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARVIN ARTLEY and JERRY MCCOY,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 04 CR 181—**John C. Shabaz**, *Judge.*

ARGUED OCTOBER 17, 2006—DECIDED JUNE 5, 2007

Before EASTERBROOK, *Chief Judge*, and BAUER and FLAUM, *Circuit Judges.*

BAUER, *Circuit Judge.* Jerry McCoy and Marvin Artley pleaded guilty to drug-related offenses in violation of 21 U.S.C. §§ 846 and 841(a)(1), respectively. The district court sentenced McCoy to 328 months' imprisonment and imposed a fine of $50,000 and sentenced Artley to 125 months' imprisonment. On appeal, the defendants raise several challenges to their sentences, arguing that the district court improperly based its drug-quantity calculation and sentencing enhancements on speculative and unreliable evidence, that their sentences disproportionately punish their relevant conduct, and that their sen-

tences are unreasonable. McCoy also contends that the government breached its plea agreement with him by failing to move for a reduced sentence in light of his cooperation and that the district court erred by fining him $50,000. We affirm both sentences.

## I. Background

In early 2000, the Wisconsin Department of Justice, the Dane County Narcotics and Gang Task Force, and the Drug Enforcement Administration began conducting a joint investigation of McCoy's suspected drug-trafficking operation. During the course of the investigation, agents gathered information and collected evidence through confidential informants, controlled buys of cocaine, witness statements, financial records, surveillance, and searches. One confidential informant ("CI") reported to agents that he/she had purchased one to two ounces of cocaine from McCoy every two to three weeks between the fall of 2002 and March of 2004. The agents then used this CI to conduct six controlled buys between April 2004 and October 2004. McCoy participated in each of the buys, selling 309.64 grams of cocaine to the CI. During four of the controlled buys, Artley assisted McCoy in distributing 193.32 grams of cocaine.

McCoy and Artley were arrested and, on October 28, 2004, charged in a seven-count indictment with conspiracy to possess and/or distribute cocaine and distributing cocaine. Both defendants pleaded guilty pursuant to written plea agreements. McCoy pleaded guilty to one conspiracy count; Artley pleaded guilty to one distribution count.

The probation officer prepared each defendant's Presentence Investigation Report (PSR), using the 2004 Sentencing Guidelines. The PSRs included the following statements taken from the defendants' drug associates:

- Aaron McCarroll told agents that he had received three ounces of cocaine base from McCoy in the summer of 1998. McCarroll also told agents that between the summer of 1998 and the summer of 2000, he had observed McCoy deliver a quarter ounce "8-ball" of cocaine to Damon Glen seven or eight times; two to six quarter ounce "8-balls" of cocaine to Maurice Cerro seven to ten times; an ounce of cocaine to Randall Springen approximately seven times; and four ounces of cocaine to Adderrazzak Laiti twice.

- Courtney Westfall, who later married McCoy, told investigators that she had observed a pile of cocaine at McCoy's office that she estimated to be ten inches by twelve inches by six inches located next to a box of small plastic bags and two bottles of vitamin B-12. Westfall identified Emanuel Whitfield, Antwon Berry, and Keith Maggitt as McCoy's drug-trafficking associates.

- David Mitchell told agents that he had sold cocaine for McCoy and that, from the Fall of 1999 to January 2001, he had purchased approximately five kilograms of cocaine from McCoy. He also had observed nine ounces of cocaine at McCoy's apartment and identified Whitfield, Berry, Maggitt, and McCarroll as McCoy's drug-trafficking associates.

- Zandra Hagberg told agents that she had spent time at McCoy's business and had helped him with his bookkeeping. She had learned that McCoy's hotdog business was a cover for his drug-trafficking business and estimated that McCoy sold one-quarter to one-half a kilogram of cocaine every week from his office in late 1999 and early 2000. Hagberg also had observed McCoy cut raw cocaine, put the cocaine in bags, and distribute cocaine from his residence.

- Darryl Franklin told agents that, from December 1999 to March 2000, he had purchased eight to ten kilograms of cocaine from Whitfield at McCoy's office. He stated that McCoy was present during several of those transactions.

- Catherine Verriden told agents that she had purchased an "8-ball" of cocaine from McCoy and his associates every week or two between October 2002 and May 2003. Verriden stated that she had purchased the cocaine at Artley's Fish Hatchery Road residence.

- William McCoy told investigators that Jerry McCoy sold cocaine. On July 26, 2003, Madison police investigated a homicide of one Adrian Bowdry at Artley's residence. Artley, Jerry McCoy, William McCoy, and Nicole Conteras were all present during the shooting. William McCoy told investigators that, prior to the shooting, he had observed his brother with approximately a half a kilogram of cocaine in Artley's living room. Jerry McCoy told investigators that the half a kilogram of cocaine belonged to William McCoy. During the search of the residence, investigators recovered two firearms, nine millimeter cartridge casings, live ammunition, drug paraphernalia, small plastic bags, a scale, rubber gloves with cocaine residue, and Inositol. Investigators also recovered a cereal box outside of Artley's apartment complex containing 38.6 ounces of cocaine.

- Alicia Smith told agents that she had met McCoy in 2001, and shortly thereafter, began buying cocaine from him that she would later resell in smaller quantities. Smith first bought an ounce from McCoy. For the next six months, she purchased a half ounce of cocaine from McCoy every

two weeks. She then started buying four-and-a-half ounces from McCoy every two weeks for two months. Smith also stated that, prior to the shooting of Bowdry, she bought cocaine from McCoy at Artley's residence five to eight times. She did not say how much cocaine she purchased during the transactions at Artley's residence, but she did state that Artley was present during approximately half of those transactions. Smith told agents that she obtained a kilogram of cocaine from McCoy seven to ten times from September 2003 to December 2003. Smith also said that she had delivered cocaine for McCoy to Verriden, Whitfield, and Montrell Savage.

- Savage told investigators that McCoy was buying between one and two kilograms of cocaine a month and then cutting the cocaine to make three or four kilograms before reselling it.

- A second confidential informant told agents that, in April of 2004, he had received four ounces of cocaine base, a kilogram of cocaine, and two pounds of marijuana from McCoy.

## A. McCoy's PSR and Sentencing Hearing

McCoy's PSR determined that he was responsible for conspiring with Artley and others to possess and/or distribute at least 15 kilograms but not more than 50 kilograms of cocaine. The PSR recommended applying a two-level enhancement, pursuant to U.S.S.G. § 2D1.1(b)(1), for possession of a dangerous weapon in a place where drugs were present, and a four-level enhancement, pursuant to U.S.S.G. § 3B1.1(a), for being an organizer or leader of a criminal activity involving five or more participants. McCoy filed a written objection to the PSR, challenging

the inclusion of the uncharged drug amounts and the leader/organizer enhancement. McCoy complained that the hearsay statements taken from his former drug associates and family members unfairly increased his culpability from 309.64 grams of cocaine, which was the amount seized during the controlled buys, to an uncharged, collateral amount of between 15 and 50 kilograms of cocaine.

At sentencing, McCoy did not call a single witnesses to dispute the statements contained in the PSR. In determining McCoy's relevant conduct, the district court stated that it had considered the 309.64 grams of cocaine seized during the controlled buys, the 38.6 ounces of cocaine that agents recovered outside of Artley's apartment after the shooting of Adrian Bowdry, and the cocaine packaging that agents found in the trash at McCoy's residence. The district court also relied on statements from the PSR made by Mitchell, Franklin, Hagberg, McCarroll, Smith, Savage, Verriden, and the confidential informants in calculating McCoy's relevant conduct. The district court concluded that a reasonable estimate of the cocaine quantities distributed by McCoy fell well within the range of at least 15 but not more than 50 kilograms of cocaine.

After determining McCoy's relevant conduct, the district court calculated McCoy's advisory sentencing guideline range. The calculations started with a base offense level of 34, according to § 2D1.1(c)(3), because the offense involved at least 15 but less than 50 kilograms of cocaine. The district court added two additional levels, finding that McCoy was involved in a jointly undertaken criminal activity with Artley and others in which firearms were possessed. The district court also applied a four-level enhancement to McCoy's base level because it found that he had acted as the leader of an extensive criminal activity that involved five or more participants. After

applying a three-level credit for acceptance of responsibility, the district court calculated that McCoy's total offense level was 37. Based on an offense level of 37, and a criminal history category of IV, the district court determined that the imprisonment range for McCoy was 292 to 360 months.[1] The district court ordered McCoy to pay a $50,000 fine and sentenced him to 328 months in prison and six years of supervised release.

### B. Artley's PSR, PSR Addendum, and Sentencing Hearing

The PSR estimated that Artley's relevant conduct involved at least 500 grams but not more than two kilograms of cocaine, which, under § 2D1.1(c)(7), resulted in an advisory guideline base offense level of 26. After applying a two-level enhancement (not challenged on appeal) for possession of a loaded firearm in a place where drugs were present and a three-level credit for acceptance of responsibility, the PSR recommended that Artley's offense level total 25.

Artley filed objections to the PSR, contending that the drug-quantity estimate was speculative and in violation of his due process rights. Specifically, Artley objected to the PSR's statement that he had worked with Jerry McCoy for several years.[2] Artley also objected to the PSR's reliance on statements made by William McCoy, Verriden,

---

[1] The imprisonment range is 295 to 365 months; however, the range is limited by the 30-year statutory maximum imprisonment term.

[2] Artley argued that such a statement was speculative and inconsistent with his incarceration from May 10, 2000 to May 14, 2002, his subsequent stay in a halfway house until mid-August 2002, and his imprisonment from September 10, 2003 to February 6, 2004.

and Smith. Artley argued that the inconsistencies in the statements made by William McCoy and Jerry McCoy and their efforts to blame each other for the drugs present at Artley's apartment the night of the shooting rendered William McCoy's statements unreliable. Artley next argued that Verriden's statements were insufficiently reliable because of her assertion that she had contacted Artley to buy cocaine at times Artley was in prison and her claim that she began buying cocaine at Artley's Fish Hatchery Road apartment in October 2002 even though he had not yet moved into that apartment. Finally, Artley argued that Smith contradicted herself by stating that she had been to Artley's apartment for cocaine transactions five to eight times, when she also told investigators that she had made four four-and-a-half ounce purchases of cocaine from McCoy.

An addendum to the PSR responded to Artley's objections, noting that it was reasonable to conclude that Artley knew about the drugs being distributed from his residence. Both William and Jerry McCoy stated that the other was in possession of cocaine at Artley's residence the night Artley shot Bowdry. That same night, police recovered cocaine outside of Artley's apartment. William McCoy, Verriden, and Smith all stated that Jerry McCoy and Artley sold drugs together out of Artley's residence on Fish Hatchery Road. Artley admits that in November 2002 he was living at his Fish Hatchery Road apartment.

Finally, the addendum explained that Smith's statements were not contradictory. Smith did not clarify the amount of cocaine she had purchased during her transactions at Artley's residence. Her statement that she had purchased four-and-a-half ounces of cocaine from McCoy every two weeks for two months did not contradict her statement that she also had been to Artley's residence five to eight times to purchase cocaine.

The district court disagreed with Artley's objections and adopted the portions of the PSR and PSR Addendum that it found sufficiently reliable: the drugs seized during the controlled buys; the statements of William McCoy, Smith, and Verriden; and the kilogram of cocaine recovered by the police outside of Artley's apartment during the homicide investigation. Based on this evidence, the district court determined that Artley's relevant conduct involved at least 500 grams but less than two kilograms of cocaine. Having accepted the PSR's recommendations, the district court first determined Artley's sentencing guidelines range to be 110 to 137 months' imprisonment and then sentenced him to 125 months' imprisonment and three years of supervised release.

Each defendant filed a timely notice of appeal, and on May 10, 2005, we consolidated their appeals.

## II. Discussion

### A. Reliability of the Evidence Used in Sentencing Defendants

McCoy and Artley first argue that the district court erred by relying on speculative and unreliable hearsay statements contained in the PSR in calculating the amount of cocaine attributed to them as relevant conduct for sentencing purposes. We review a district court's findings of relevant conduct, drug quantity, and role in the offense for clear error. *United States v. Ngatia,* 477 F.3d 496, 500 (7th Cir. 2007). We will affirm the district court's decision unless, after considering all of the evidence, we are left with a "definite and firm conviction that a mistake has been committed." *United States v. Romero*, 469 F.3d 1139, 1147 (7th Cir. 2006) (citing *United States v. Bennett*, 461 F.3d 910, 912 (7th Cir. 2006).

Although "a defendant has a due process right to be sentenced on the basis of accurate information . . . the evidentiary standards that apply at sentencing are not as stringent as those applicable in a criminal trial." *United States v. Taylor*, 72 F.3d 533, 543 (7th Cir. 1995) (citation omitted). The government is required to prove the amount of drugs attributable to a defendant by a preponderance of the evidence. *United States v. Porter*, 23 F.3d 1274, 1277 (7th Cir. 1994). The sentencing guidelines require judges to limit consideration to information that has a "sufficient indicia of reliability to support its probable accuracy." *See* U.S.S.G. § 6A1.3(a).

A district court may rely on the PSR in ruling on factual issues in the sentencing context as long as the PSR is based upon sufficiently reliable information. *Romero*, 469 F.3d at 1147 (citing *United States v. Willis*, 300 F.3d 803, 807 (7th Cir. 2002). When the court relies on information contained in the PSR at sentencing, it is the defendant's burden to show that the PSR is inaccurate or unreliable. *Id.* (citing *United States v. Salinas*, 365 F.3d 582, 587 (7th Cir. 2004)). "When a defendant has failed to produce any evidence calling the report's accuracy into question, a district court may rely entirely on the PSR." *Taylor*, 72 F.3d at 543.

McCoy argues that several statements relied on by the district court are presumptively unreliable because they were given with government involvement, described past events, and were not subject to adversarial testing. Specifically, he argues that the district court should not have relied on the statements taken from Franklin, Hagberg, McCarroll, and Verriden because their statements described drug activity that took place years before they provided their statements. The volume and consistency of these statements, however, refute his challenge to their reliability. The statements relied on by the district court are consistent and corroborated: they discuss

the same locations where drugs were being sold, offer similar amounts of drugs being distributed, and involve the same people as participants in McCoy's drug-trafficking operation.[3]

When addressing whether two or more offenses are part of the same course of conduct, a district court must examine whether the government has established a similarity, regularity, and temporal proximity between the uncharged acts and offense of conviction. *See United States v. Acosta*, 85 F.3d 275, 281 (7th Cir. 1996). In this case, the district court did not explain how these three factors supported a finding that McCoy's previous drug activity was part of the same course of conduct charged in the indictment. Nevertheless, any error was harmless. Though the PSR suggests that McCoy's drug dealing may have occurred during two distinct time periods—1999 to early 2001 and late 2002 to 2004—the district court found that the amount of drugs involved in the second period of drug dealing, which was undoubtedly part of the same course of conduct alleged in the indictment, well exceeded the fifteen kilograms of cocaine necessary to place McCoy in the requisite base offense level. Indeed, the PSR stated, and the district court accepted, that McCoy sold seven to ten kilograms of cocaine to Smith between September 2003 and December 2003; one to two kilograms of cocaine to a confidential informant between the fall of 2002 and March of 2004; and four ounces of crack (the equivalent of

---

[3] McCoy claims that he and Artley were the only members of the conspiracy. He argues that the district court erred in finding that he was the leader/organizer of a conspiracy involving five or more participants. We disagree. The PSR statements adopted by the district court confirm that at least five individuals—Verriden, Whitfield, Savage, Smith, and Artley—sold drugs for McCoy between late 2002 and 2004.

eleven kilograms of cocaine powder for Guidelines pur-
poses) to a second confidential informant in 2004.

Artley argues that the district court did not resolve his
objections to the PSR prior to determining his relevant
conduct. We disagree. The addendum to the PSR ade-
quately addressed and clarified Artley's objections to
the statements made by William McCoy, Verriden, and
Smith. Again, their statements are consistent and corrobo-
rating in that they all agree that Artley and McCoy sold
cocaine out of Artley's residence on Fish Hatchery Road.
Like McCoy, Artley provided no evidence to challenge the
factual accuracy of his PSR; nor did he call any witnesses
to rebut any of the evidence offered against him.

Artley also contends that the district court did not
inquire into the scope of his joint undertaking with McCoy,
the agreements they made, or the foreseeability of any
particular drug quantity in determining his relevant
conduct. In determining relevant conduct under the
guidelines, a defendant engaged in a jointly undertaken
criminal activity is liable for all reasonably foreseeable
acts performed in furtherance of the jointly undertaken
criminal act. *See* U.S.S.G. § 1B1.3 (2004). In drug dis-
tribution cases, courts are instructed to calculate guide-
line ranges based not only on the charged drug amounts
but also on the uncharged amounts "that were part of the
same course of conduct or common scheme or plan as the
offense of conviction." *United States v. Bullock*, 454 F.3d
637, 641 (7th Cir. 2006).

After determining which witness statements were
reliable, the district court found that Artley worked with
or for Jerry McCoy when he was not incarcerated; Artley's
residence was used by Jerry McCoy and others to distrib-
ute cocaine; Artley observed a significant amount of
cocaine flow out of his residence in full view; and Artley
was a part of these sales. In reviewing these factual

findings of the district court, we are not left with a "definite and firm conviction that a mistake has been made." *See Romero*, 469 F.3d at 1147.

Artley admitted that he was aware that McCoy used his apartment to distribute drugs. The four controlled buys demonstrated that Artley sold cocaine with McCoy. The statements of William McCoy, Verriden, and Smith all confirmed that McCoy and Artley sold drugs together out of Artley's apartment. Based upon the quantities of cocaine that McCoy and Artley were distributing, it was reasonably foreseeable that McCoy would have cocaine in his possession in Artley's residence the night of the shooting.[4] Also, based on William McCoy's and Jerry McCoy's statements to the police following the shooting, it is likely that the kilogram of cocaine recovered by police outside of Artley's apartment came from Artley's apartment. Considering only the 193.93 grams and one kilogram of cocaine recovered by the police, Artley's relevant conduct is well within the district court's finding that his relevant conduct involved at least 500 grams but less than 2 kilograms of cocaine. Thus, the district court did not err in determining Artley's relevant conduct or drug quantity.[5]

---

[4] Both William McCoy and Jerry McCoy confirmed that a large amount of cocaine was present in Artley's apartment on the evening of July 26, 2003. They merely dispute its ownership. Because the McCoy brothers corroborate its existence, it is reasonable to conclude that Artley also knew about this cocaine.

[5] McCoy challenges his two-level weapons enhancement under U.S.S.G. § 2D1.1(b) for the first time on appeal. "Section 1B1.3(a)(1)(B) makes clear that defendants can also be on the hook for firearms possessed by their coconspirators so long as such possession was reasonably foreseeable." *United States v. Luster*, 480 F.3d 551, 558 (7th Cir. 2007). The record established

(continued...)

**B. Reasonableness of Sentences**

The defendants next contend that their respective sentences are unreasonable. After *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), we review criminal sentences for unreasonableness. Appellate courts are guided by the factors in 18 U.S.C. § 3553(a) when deciding whether a particular sentence is unreasonable. *Booker*, 125 S. Ct. at 766.

While McCoy never asked the district court to consider his cooperation with the government prior to his sentencing, he now argues that his sentence is unreasonable because the district court failed to give him credit for his "very significant" cooperation. He contends that even if the government did not breach the plea agreement, the court still should have considered his cooperation in determining his sentence. This Court's role is not to chose between possible sentences, but rather to review the reasonableness of the sentence imposed by the district court. *United States v. Lopez*, 430 F.3d 854, 857 (7th Cir. 2005). Given that the district court considered and adequately discussed the factors in § 3553(a) and explained its reasoning for sentencing McCoy to the midpoint of the sentencing range, McCoy's sentence was not unreasonable.

---

[5] (...continued)
that McCoy and Artley both used Artley's residence to store and distribute drugs. Artley admittedly possessed firearms at his residence. It is probable that these firearms were intended to protect McCoy and Artley and their drug-operation from would-be thieves. In fact, Artley did just that when he shot Bowdry on July 26, 2003. Because McCoy reasonably could have foreseen that Artley would possess firearms in his residence to protect their drugs and money, the district court did not err in applying the enhancement.

Artley argues that his sentence is unreasonable because it punishes him for a larger drug quantity than the evidence supports. He contends that the district court may have erroneously included an additional kilogram of cocaine when determining his guideline range. We disagree. Had the district court erroneously included an extra kilogram of cocaine in addition to the kilogram of cocaine recovered by the police outside of Artley's residence and the 193 grams of cocaine from the controlled buys, the district court could not have determined that Artley's relevant conduct involved less than two kilograms of cocaine.

Both defendants also contend that their sentences are unreasonable because they amount to a "tail wagging the dog" situation. Specifically, McCoy argues that his sentence was based on the district court's relevant conduct determinations, which disproportionately increased his guidelines range from 57 to 71 months to 292 to 360 months; Artley argues that his sentence unreasonably punishes him for ten times the amount of cocaine involved in his offense of conviction.

Although we have admonished prosecutors repeatedly "not to indict defendants on relatively minor offenses and then seek enhancement sentences later by asserting that the defendant has committed other more serious crimes for which . . . the defendant was not prosecuted and has not been convicted," *see United States v. Spiller*, 261 F.3d 683, 691 (7th Cir. 2001); *United States v. Bacallao*, 149 F.3d 717, 721 (7th Cir. 1998); *United States v. Duarte*, 950 F.2d 1255, 1263 (7th Cir. 1991), we have stricken sentences only where the government has failed to establish that the relevant conduct was part of the same course of conduct or common scheme or plan as the conviction. *See Bacallao*, 149 F.3d at 721; *Duarte*, 950 F.2d at 1263-64. Here, as we discussed above, the district court appropriately determined the defendants' relevant conduct by

properly applying § 1B1.3 of the sentencing guidelines, and we find that defendants' sentences are reasonable.

### C.  McCoy's Plea Agreement

According to McCoy, as part of his plea agreement, he agreed to cooperate with the government with the understanding that the government would move the district court to impose a sentence reflecting his assistance. McCoy argues that the government breached the plea agreement. Because McCoy failed to present this argument to the district court at sentencing, we review the district court's judgement for plain error. *United States v. D'Iguillont*, 979 F.2d 612, 614 (7th Cir. 1992). In order to prevail, McCoy must show that there was error; the error was plain or obvious; the error affected his substantial rights; and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Salazar*, 453 F.3d 911, 913 (7th Cir. 2006) (citation omitted).

"A prosecutor's refusal to request a downward departure is . . . not reviewable for arbitrariness or bad faith." *United States v. Burrell*, 963 F.2d 976, 985 (7th Cir. 1992). The government's evaluation of the extent of a defendant's assistance is accorded substantial weight. *See* U.S.S.G. § 5K1.1, Application Note 3. "The prosecutor, not the court, is to assess the value of the defendant's assistance." *Burrell*, 963 F.2d at 985. However, "the government must fulfill any promise that it expressly or impliedly makes in exchange for a defendant's guilty plea." *United States v. Ingram*, 979 F.2d 1179, 1184 (7th Cir. 1992) (citing *Santobello v. New York*, 404 U.S. 257, 261 (1971)). Because plea agreements are contracts, their content and meaning are determined according to ordinary contract principles. *Id.* "A defendant's rights under a plea agreement are limited by what the parties in fact agreed to." *United*

*States v. Lezine*, 166 F.3d 895, 901 (7th Cir. 1999). In exchange for McCoy's guilty plea, the government agreed to dismiss the remaining counts of his indictment. Additionally, the plea agreement stated:

> If the defendant provides substantial assistance before sentencing, the United States agrees to move the Court to impose a sentence reflecting that assistance. . . . The decision whether to make such a request based upon substantial assistance rests entirely within the discretion of the United States Attorney's Office for the Western District of Wisconsin.

McCoy argues that because the government acknowledged that he had provided substantial assistance prior to sentencing, it was obligated to file a motion for downward departure under U.S.S.G. § 5K1.1.[6] In support of his contention that the government had determined that he had provided substantial assistance before sentencing, McCoy relies on two statements made by the government. First, the government told the probation officer, about a month before sentencing, that it planned to file a § 5K1.1 motion at or prior to sentencing. Second, at sentencing, the government told the court that "immediately upon his arrest . . . [McCoy] began providing very full cooperation, very significant cooperation in several cases including homicides both here and in other locations."

The government acknowledges that McCoy provided significant cooperation; however, it contends that McCoy's cooperation was not complete at the time of his sentencing and denies ever characterizing McCoy's assistance as

---

[6] Section 5K1.1 of the Sentencing Guidelines provides that "upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines."

being "substantial." The government also contends that the terms of the plea agreement gave it the sole discretion to file a U.S.S.G. § 5K1.1 motion. *See Burrell*, 963 F.2d at 985 (finding that "the government's refusal to move for departure pursuant to § 5K1.1 was within its prosecutorial discretion"). As in *Burrell*, the government did not promise McCoy a § 5K1.1 motion in exchange for his guilty plea. Instead, the government agreed to dismiss counts one through six of the indictment, and acknowledged its discretion to move for a sentence reflecting McCoy's assistance if it determined that he had provided substantial assistance. At sentencing, the government indicated that it intended to file a motion for a reduction in McCoy's sentence pursuant to Federal Rule of Criminal Procedure Rule 35(b) if McCoy's cooperation continued and asked the court to dismiss the remaining counts against McCoy.

Although the determination of when a defendant has provided substantial assistance is a power that can be abused, we agree with the government that pursuant to the plea agreement, McCoy had agreed that the decision whether to move for departure rested entirely within the government's discretion. Because the government did not induce McCoy's guilty plea by an unkept bargain and because the remaining counts against McCoy were dismissed, the government did not breach the plea agreement.

### D.  Imposition of McCoy's $50,000 Fine

Finally, McCoy argues that the district court failed to make the findings required under 18 U.S.C. § 3572(a) and U.S.S.G. § 5E1.2(d) before imposing a fine of $50,000 and that the fine was unreasonable because the amount exceeds his present and future ability to pay. When a district court determines that a fine is in order, we will

only reverse its factual finding if it is clearly erroneous. *United States v. Petty*, 132 F.3d 373, 382 (7th Cir. 1997).

Pursuant to U.S.S.G. § 5E1.2(a), "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." It is the defendant's burden to show that he does not have the financial means to pay a fine. *United States v. Gellene*, 182 F.3d 578, 597 (7th Cir. 1999). While it is true that both 18 U.S.C. § 3572(a) and U.S.S.G. § 5E1.2(d) provide factors that a district court shall consider before imposing a fine, "express or specific findings regarding each of the relevant factors . . . are not required." *United States v. Bauer*, 129 F.3d 962, 964-66 (7th Cir. 1997). As we have stated previously,

> We will remand the imposition of a fine only when it is unclear that the district court properly has considered the relevant factors, such as when the district court adopts the factual findings contained in the presentence report but deviates from the fine recommendation, if any, made by the United States Probation Office, or alternatively, if the district court declines to adopt the findings in the presentence report and makes no findings of its own.

*Bauer*, 129 F.3d at 968.

McCoy has failed to meet his burden of showing that he could not pay the $50,000 fine. At sentencing, McCoy did not address the issue of missing drug proceeds or discuss any of his financial obligations. Instead, he asserted that regardless of his past accumulation of assets, he was now indigent and lacked the means to pay a fine. The PSR resolved that while McCoy had a net worth of $6,745, his total assets were valued at $524,500. The district court noted that McCoy had been able to accumulate several expensive assets despite his limited verifiable assets. According to the PSR, McCoy had made several invest-

ments in real estate that could not be explained through legitimate financial means. From January 1999 through March 2004, McCoy and his wife deposited approximately $823,527 into several bank accounts. The PSR also noted that at the time of his arrest, McCoy was current with payment on the vehicles that he leased: a $500-per-month Mercedes Benz, a $380-per-month PT Cruiser, and his wife's Volvo SUV.

The district court accepted the factual findings in the PSR and relied on the uncontested finding that "significant drug proceeds were generated over the course of the conspiracy and all of the proceeds may not be accounted for . . . . [T]o ensure the disgorgement of any existing drug proceeds, we believe the imposition of a fine within the guideline range is necessary." The district court commented that based upon McCoy's past criminal activity, it could not make the determination that McCoy no longer had any assets and found that a $50,000 fine was both appropriate and necessary. In light of its careful consideration and acceptance of the PSR's findings, the district court did not err in imposing the $50,000 fine.

## III. Conclusion

For the reasons stated above, we AFFIRM the defendants' sentences.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*